# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 1:14-cr-00070 |
| | : | |
| v. | : | |
| | : | (Judge Kane) |
| ROLANDO CRUZ, JR., et al., | : | |
| Defendants | : | |

## MEMORANDUM

Before the Court is Defendant Rolando Cruz Jr.'s motion to suppress evidence from a search of his cell phone account. (Doc. No. 466.) The Court conducted a hearing on the motion on August 31, 2015.[1] For the reasons that follow, the Court will deny Defendant's motion.

## I.  BACKGROUND

In this motion, Defendant Rolando Cruz Jr. seeks to exclude evidence obtained from a search of his cellular telephone account conducted pursuant to a state search warrant. Defendant argues that the affidavit of probable cause is insufficient to establish a nexus between Defendant's cell phone account and the homicide in question. In addition, Defendant argues that sources of information for the affidavit were not credible, and that they should not have been included in the affidavit.

Judge Craig Trebilcock of the Court of Common Pleas for York County, Pennsylvania, signed the warrant in question on January 21, 2014. (Doc. No. 540-1 at 1.) Judge Trebilcock signed the warrant in reliance on an affidavit of probable cause signed by West York Borough Police Detective David Kahley, who testified at the August 31, 2015 hearing. (Id.) The warrant

---

[1] At the hearing, the Court heard evidence regarding both the present motion (Doc. No. 466), and Defendant's other motion to suppress evidence, which concerns a search of 914 E. Boundary St., York, Pennsylvania (Doc. No. 448).

1

authorized Detective Kahley to obtain Defendant's "[s]ubscriber information, billing information . . . call detail logs, text detail logs, data detail logs, and location information" for the dates of November 16, 2013, to November 20, 2013, from Defendant's cellular provider. (Id.) The warrant authorized the search as part of Detective Kahley's investigation into the November 20, 2013 shooting homicide of William Terrell ("Terrell," or "the victim"). (Id. at 1-2.)

It its first paragraphs, the affidavit lays out the background of Detective Kahley and his investigation. After a brief description of Detective Kahley's experience and qualifications, the affidavit details the Terrell homicide. (Id. at 2.) According to the affidavit, on November 20, 2013, at approximately 5:45 p.m., West York police responded to an emergency call stemming from a shooting "to the rear of 155 S. Highland Ave. in West York." (Id.) "The victim, William D. TERRELL was shot numerous times next to his vehicle, in which the drivers-side door was open," and he was pronounced dead after being taken to the hospital. (Id.) The next paragraph explains Detective Kahley's contact with Special Agent Scott Endy, a federal law enforcement officer who was conducting an investigation into the Bloods and Southside street gangs in York. (Id.) As described by Detective Kahley in the affidavit, Agent Endy identified Defendant and one of his co-defendants in the above-captioned action as "local leaders of the gang [who] have been involved in or are responsible for soliciting several murders." (Id.) The next section of the affidavit contains information obtained from three individuals: Tamia Rice, Eiliana Burgos, and a confidential informant. (Id. at 2-3.)

Defendant challenges the reliability of the information based on the four corners of the affidavit, and he also argues that Detective Kahley misrepresented the sources' statement in his affidavit. The Court addresses each of the individuals in turn, beginning with the parts of the

affidavit devoted to each individual, and turning to hearing testimony and evidence relevant to each.

### A. Tamia Rice

The affidavit reports that Detective Kahley interviewed Tamia Rice in connection with the homicide investigation. According to the affidavit, Rice, the victim's girlfriend, stated that Terrell "had gone to West Virginia" from November 11, 2013, through November 15, 2013, and that Defendant "was making a drug delivery." (Id.) According to the affidavit, Rice also suggested that another woman, Eiliana Burgos, traveled to West Virginia with Terrell. (Id.) According to the affidavit, "Rice stated she was unable to contact" Terrell while he was in West Virginia, but that when she spoke to him after the trip, "he told her that the drugs had melted from the heat of the vehicle and there was a major loss of money [that] he was unable to make back." (Id.) The section of the affidavit regarding Rice makes no reference to Defendant or his co-defendants.

At the hearing, the Government offered the testimony of Detective Kahley to expound on the contents of the affidavit. He testified that during the homicide investigation, Rice sought out a private interview with him at the borough hall, because she was afraid of publicly cooperating. Detective Kahley testified that during the interview Rice told him about Terrell's trip to West Virginia, and how she assumed that it involved drugs. Further, Detective Kahley testified that during the interview, Rice repeated statements that Terrell had made to her after he had returned from West Virginia: specifically, that he had placed drugs under the hood of his car on the way to West Virginia, and that the drugs had melted, resulting in a major loss of money. Detective Kahley also testified that during their interview, Rice told him Eiliana Burgos had gone on the

West Virginia trip with the victim. Finally, Detective Kahley testified that Rice gave him Terrell's cell phone, from which Detective Kahley obtained the text messages described below.

At the hearing, Defendant offered the testimony of Agent Kathryn Singer to discuss a separate interview that federal prosecutors and agents conducted on August 5, 2015, in preparation for the hearing. Along with Agent Singer's testimony, Defendant proffered Agent Singer's report of investigation from the interview and the notes Agent Singer personally took during the August 5, 2015 interview. (See Doc. No. 586, Defendant's Exhibits "2" and "3.") Rice's statements, as recounted in Agent Singer's notes and in her report, differ somewhat from those described by Detective Kahley. In particular, according to Agent Singer's notes, Rice denied saying that Terrell told her the cocaine melted in the car. Agent Singer explained the discrepancy at the hearing, clarifying that Rice did deny ever telling Detective Kahley that Terrell told her about the cocaine melting, but that Rice indicated that she received a text message about the incident, including that Terrell had suffered a "major loss." Agent Singer testified that in all other relevant respects, Rice's statements on August 5, 2015, and her statements as reported in Detective Kahley's affidavit of probable cause, were the same.

**B.      Eiliana Burgos**

The second individual identified as a source in the affidavit is Eiliana Burgos. According to the affidavit, Burgos, who was another of Terrell's girlfriends, accompanied him to West Virginia. (Doc. No. 540-1 at 2.) As per the affidavit, Burgos stated that she and Terrell checked into a hotel, that the victim left, and that when he returned, "he appeared nervous, worried and was 'teary eyed.'" (Id.) Thereafter, according to the affidavit, Burgos overheard Terrell talking during telephone calls he placed about how "[s]omething went wrong," and how "it melted," and

4

how Terrell was "in the hole." (Id.) The affidavit reports that Burgos "spoke with [Defendant] after [Terrell] was shot and [Defendant] stated he was in New York, but she then saw [Defendant] in York, Pa about two-hours after he told her that." (Id.)

At the hearing, the Government offered Detective Kahley's testimony to expound on this portion of the affidavit. He testified that after speaking with Rice, he went to Burgos' residence and place of employment to find her. Detective Kahley testified that he interviewed Burgos on November 26, 2013, and that during the interview, she confirmed that she was dating the victim at the time of his death and that she had gone with him to West Virginia. Detective Kahley testified that during the interview, Burgos recounted how Terrell was nervous, and how Terrell made phone calls and said that "something went wrong" and "it melted."

At the hearing, Defendant offered the testimony of Officer Stephen Aderhold to discuss a separate interview that he and a federal prosecutor conducted on August 17, 2015, in preparation for the hearing. Along with Officer Aderhold's testimony, Defendant proffered Officer Aderhold's memorandum summarizing the interview and the notes he took during the interview. (See Doc. No. 586, Defendant's Exhibits "4" and "5.") Officer Aderhold's description and notes show that Burgos believed that she was going to West Virginia to meet the victim's family, that Burgos reported that she did not know that Terrell dealt drugs until after his death, and that Burgos described Terrell as "panicky" while they were in West Virginia. According to the interview memorandum, Burgos stated that Terrell was searching through his cell phone for Defendant's phone number and the number of a co-defendant, because Terrell "could not find" them or had deleted them. According to the notes and memorandum, Burgos also confirmed that shortly after Terrell was killed, she received a phone call from Defendant from New York

5

denying any knowledge or involvement in the homicide. At the hearing, Officer Aderhold testified that the August 17, 2015 interview did not reveal any discrepancies between the affidavit of probable cause and Burgos's updated statement.

### C. Confidential informant

In addition to the two women who provided information, Detective Kahley's affidavit also reports information from a confidential informant. According to the affidavit, Detective Kahley "interviewed an informant who stated he received information that [Defendant] gave [Terrell] a brick of cocaine, and the product had melted in [Terrell's] vehicle, causing [Defendant] . . . to have a grudge against [Terrell] which led to his murder." (Doc. No. 540-1 at 2.) The affidavit does not provide any identifying information as to the informant, nor does it purport to establish the basis for the informant's knowledge.

At the hearing, Detective Kahley reported that he had interacted with the informant on at least two occasions during the course of the investigation, beginning in December 2013. Detective Kahley also testified that the informant did not explain how he knew Defendant or the victim, or how he learned about Defendant's involvement in the homicide.

### D. Facts from direct investigation

Separate from the information provided by the informants, the affidavit also contains a number of paragraphs describing facts that Detective Kahley obtained through direct investigation. (Doc. No. 540-1 at 2-3.) For example, Detective Kahley reports that he verified that the victim checked into a hotel in Charleston, West Virginia on November 15, 2013. (Id. at 2.) The affidavit also contains "text message content from a text [messaging] App on [Terrell's]

6

phone."[2]  (Id. at 2.)  According to the affidavit, "[b]etween 11/15/13 and 11/18/13 [Terrell] sen[t] text messages to different people stating 'I'm in a jam,' 'if I die . . . tell my daughters I luv them,' 'I gotta get that $$$ tho . . . I cnt go bk with out 1500.'"  (Id.) (ellipsis in original).  In the affidavit, Detective Kahley also reports "view[ing] conversations between [Terrell] and [Defendant]," including one exchange on November 16, 2013, where Terrell sent Defendant a message that said, "The worst happen to me," after which Defendant replied, "How is it a set back," and "You didn't lose nothin right bc I can't take no L[.]"  (Id.)  The victim replied, "It's a major set bk."  (Id.)

Based on the affidavit, Judge Trebilcock signed Detective Kahley's warrant application on January 21, 2014.  The Court now turns to Defendant's challenges to the affidavit, and by extension, the search warrant.

## II. DISCUSSION

### A. Standards governing motions to suppress

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. When a search warrant authorized a search, the proponent of the motion to suppress evidence from the search bears the burden of establishing that his or her Fourth Amendment rights were violated.  United States v. Correa, 653 F.3d 187, 190 (3d Cir. 2011) (citing Rakas v. Illinois, 439 U.S. 128, 132 n.1 (1978)); see United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995).  The challenger must make a showing by a preponderance of the evidence.  United States v. Matlock, 415 U.S. 164, 178 n.14 (1974).  At a hearing on a motion to

---

[2] These messages are drawn from Terrell's cell phone, whereas Judge Trebilcock's warrant and Detective Kahley's affidavit concerned information sought from Defendant's cell phone.  As noted above, Tamia Rice gave Detective Kahley Terrell's cell phone.

suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." United States v. Richardson, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) (citations omitted).

B. **Probable cause**

Defendant argues that Detective Kahley's affidavit is insufficient to establish probable cause because it "contains partial and incomplete information," and in particular, it places too much reliance on the veracity of an unnamed informant. (Doc. No. 467 at 6.) In opposition, the Government argues that the totality of the circumstances, including Terrell's text messages, the information from the confidential and known sources, and the chronology of events was sufficient to establish probable cause. (Doc. No. 540 at 10-11.)

Search warrants must be supported by probable cause. Probable cause for the issuance of a warrant is found where, under the totality of the circumstances, "there is a fair probability that . . . evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). "[P]robable cause can be, and often is, inferred by considering the type of crime, the nature of the [evidence] sought," and inferences about where evidence of the crime may be found. United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001) (internal citations and quotations omitted). Upon a challenge to a probable cause determination, courts apply a deferential standard of review. United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents, 307 F.3d 137, 146 (3d Cir. 2002). This means that "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." Id. at 147 (quoting United States v. Jones, 994 F.2d

1051, 1054 (3d Cir. 1993)). As such, the question before the Court is not whether probable cause actually existed, but instead whether Court of Common Pleas Judge Trebilcock possessed "a substantial basis" for finding probable cause. Id. (internal quotations omitted).

Under these facts, the Court finds that Judge Trebilcock had a substantial basis for finding probable cause to issue the search warrant. While Rice did not link Defendant to the homicide, she did describe the trip to West Virginia and the connection to drug trafficking, along with a "major loss." Burgos corroborated Rice's statements about the trip, and implicated Defendant as, at the very least, Terrell's close associate, because Terrell wanted to communicate with Defendant after the "major loss," and because Defendant called Burgos after the homicide, albeit to deny any knowledge or involvement. Independent investigation of hotel records corroborated that Defendant had indeed been in West Virginia. And critically, the Court finds that the text messages <u>between</u> <u>Defendant</u> <u>and</u> <u>Terrell</u> drawn from Terrell's cell phone provide strong support for probable cause.

Defendant urges the Court to read the text messages as "innocent" indications that Terrell was attempting to raise money because of his "dire trouble related to melted drugs." (Doc. No. 467 at 6.) The Court finds Defendant's reading of the text messages untenable. The first texts, sent to various individuals other than Defendant, establish that Defendant's situation, arising out of the melted drugs, was sufficient for Defendant to fear for his life. (See Doc. No. 540-1 at 2.) In the exchange between Defendant and the victim, Defendant was interested in the precise nature of the "set back." (Id.) Defendant also stated, "<u>You</u> didn't lose nothin right bc <u>I</u> can't take no L." (Id.) (emphasis added). Detective Kahley read 'L' in that message to mean 'loss,' and the Court finds that reading credible. At the very least, Defendant linked himself to Terrell's

9

predicament with that text message. This alone may have been enough for Judge Trebilcock to have a substantial basis to find a "fair probability" that evidence related to the homicide could be found in Defendant's cell phone records.[3] See Gates, 462 U.S. at 238. When coupled with the confidential informant's statement directly implicating Defendant, the basis for probable cause is apparent.[4]

### C. The good faith exception[5]

In addition, even if a court finds probable cause lacking, evidence from the search would be suppressed only if the "good faith exception" to the exclusionary rule did not apply. Defendant argues that the good faith exception should not apply here because Detective Kahley's affidavit "contains partial and incomplete information, and the presence of these gaps shows the affiant to have been reckless and to have disregarded the truth." (Doc. No. 467 at 8.)

Where a warrant is defective or lacks probable cause, evidence from the search will not be suppressed when the officers that executed the search warrant acted in "objectively

---

[3] This is especially true because the known text messages between Defendant and Terrell conclusively established a nexus between Terrell's predicament and Defendant's cell phone data, and inferences drawn from the chronology of Terrell's "set back" and his death connect Terrell's death and the "set back."

[4] The Court agrees with Defendant that the affidavit does not establish the basis of the confidential informant's knowledge about Defendant or Defendant's involvement in the homicide, however to hold that deficiency to be dispositive would ignore the Gates mandate eschewing the rigid two-prong test that existed before. See Gates, 462 U.S. at 232 ("Informants' tips, like all other clues and evidence coming to a policeman on the scene may vary greatly in their value and reliability. Rigid legal rules are ill-suited to an area of such diversity.") (quotations omitted).

[5] Given the Court's finding regarding probable cause, the Court considers the good faith exception only in the alternative.

reasonable reliance" on the lawfulness of the warrant. United States v. Leon, 468 U.S. 897, 925 (1984). This exception to the exclusionary rule applies unless a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization. United States v. Loy, 191 F.3d 360, 367 (3d Cir. 1999). Courts have identified four situations where reliance on a signed search warrant would not be "in good faith:" (1) when the issuing magistrate "was misled by information in an affidavit that the affiant knew was false;" (2) when "the issuing magistrate wholly abandoned [his or her] judicial role;" (3) when the affidavit in support of the warrant is "so lacking in the indicia of probable cause as to render official belief in its existence entirely unreasonable;" and (4) when the warrant is so "facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably believe it was valid." Leon, 468 U.S. at 922-23). In those circumstances, a reasonable officer should not conduct a search, even where a signed search warrant authorizes one, and evidence uncovered in such a search will be suppressed. See id.

Defendant argues that the first of the Leon scenarios, rooted in Franks v. Delaware, 438 U.S. 154 (1978), applies to his situation. See Leon, 468 U.S. at 914, 923. To prevail under Franks, there must have been a false or misleading statement or a misleading omission in an affidavit of probable cause, and the defendant must show "[1] that bad faith or reckless disregard existed on the part of the affiant, and [2] that there would have been no probable cause but for the incorrect statement." United States v. Shields, 458 F.3d 269, 276 (3d Cir. 2006).

Defendant argues that the discrepancies between the statements that Rice and Burgos made to Detective Kahley and the statements they made to federal prosecutors later, coupled with the lack of information regarding the confidential informant's veracity, demonstrate that

11

Detective Kahley acted with reckless disregard for the truth when he prepared the affidavit of probable cause. However, testimony from Agent Singer and Officer Aderhold at the hearing, together with the August 2015 interview materials those two witnesses prepared, show that the discrepancies between Rice and Burgos' statements reported in the affidavit and Rice and Burgos' recollections are comparatively minor in relation the complete statements that those two women made. As such, those discrepancies cannot support the argument that Detective Kahley acted with reckless disregard in compiling his affidavit. Further, the Court credits Detective Kahley's testimony that he was familiar with the confidential informant and viewed him as reliable, especially given that the confidential informant's statement was corroborated to the extent that the text messages confirmed that Defendant was involved in Terrell's "set back." As a result, the Court finds that Detective Kahley did not act with knowing or reckless disregard for the truth when he reported the confidential informant's statement to Judge Trebilcock. As a result, even in the absence of probable cause, a reasonable officer would have been justified in relying on the signed search warrant, so the evidence would not be suppressed under Franks.

### III. CONCLUSION

For the foregoing reasons, the Court will deny Defendant's motion to suppress evidence from a search of his cell phone data. An order consistent with this memorandum follows.[6,7]

---

[6] Given the Court's findings on probable cause and the good faith exception, the Court does not reach the Government's alternative argument that grand jury subpoenas, issued in February and April 2014 in connection with the above-captioned action, provide an "independent basis" for the cell phone records. (Doc. No. 540 at 17) (citing Murray v. United States, 487 U.S. 533 (1988)).

[7] In his supplemental brief in support of his motion, Defendant described late-disclosed Government information that Rice, Burgos, and the confidential informant had "recanted" all or portions of their statements that Detective Kahley relied upon in his affidavit of probable cause.

(Doc. No. 546 at 2-3.) As detailed above, Rice and Burgos did not "recant" their statements, and the Government clarified at the hearing that the confidential informant had similarly not recanted. In passing, the Court observes that the recantation of a witness statement made to law enforcement and included in an affidavit of probable cause does not speak to whether probable cause existed at the time of the warrant or to an affiant's knowing or reckless disregard for the truth so long as the recantation occurred <u>after the affidavit was sworn</u>. See <u>Freeman v. County of Bexar</u>, 210 F.3d 550, 555 n.3 (5th Cir. 2000); <u>United States v. Blair</u>, No. 12-275, 2013 WL 5593001, at *5 (W.D. Pa. Oct. 10, 2013) ("[A witness's] subsequent decision to recant his statements does not establish that [an affiant] knowingly and intentionally or with reckless disregard for the truth included false information in the affidavit.").